UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

9178-6103 QUIBEC INC.,

              Plaintiff,        MEMORANDUM AND ORDER

       - against -          09-CV-144(MDG)

UNITRANS-PRA CO., INC.; FT&T
CONSULTING, INC. and VLADIMIR
LYSOGORSKY,

              Defendants.

- - - - - - - - - - - - - - - - - -X


     In this action brought under general maritime law and the
Carriage of Goods by Sea Act of 1936 ("COGSA"), 46 U.S.C. § 30701,[1]
plaintiff 9178-6103 Quibec Inc. ("Quibec") asserts claims for
breach of contract and replevin against defendants Unitrans-Pra
Co., Inc. ("Unitrans"), FT&T Consulting, Inc. ("FT&T") and Vladimir
Lysogorsky (collectively, "defendants") with respect to five
vehicles owned by plaintiff.  See Complaint ("Compl.") (DE 1 and
attached as Ex. A to DE 22-3).  Plaintiff alleges in its Complaint
that defendants had been employed to ship the vehicles to Kotka,
Finland, but the defendants refused to release the vehicles upon
arrival without payment of $104,000.  See id. at ¶¶ 10, 13.  The
plaintiff paid $52,000 to defendants and obtained the release of

---

[1]  COGSA was enacted in 1936, 46 U.S.C. App'x § 1300–15, ch. 228,
49 Stat. 1207 (1936), and, in 2006, was reclassified  as a note to
46 U.S.C. § 30701 following the general revision and enactment into
positive law of a revised Title 46, Shipping, by Pub. L. 109–304,
120 Stat. 1485 (Oct. 6, 2006).  Many courts continue to refer to
the provisions of COGSA by their prior statutory citations.

four of the vehicles, but defendants continue to hold the fifth vehicle, a Bentley. See id. at ¶ 14.

Plaintiff commenced this action on January 13, 2009 by order to show cause for injunctive relief for the release of the Bentley. See DE 2 (Memorandum of Law in Support of Order to Show Cause). Following a hearing held on March 6, 2009, the parties entered into an agreement consenting to entry of an order resolving plaintiff's motion and providing for release of the Bentley after plaintiff deposits $52,000 to be held in escrow pending final determination of this action. See DE 15 (order); 14 (consent of the parties filed).

After completion of discovery, defendants moved for summary judgment on all claims, seeking dismissal of the complaint and an order directing plaintiff to turn over $52,000 held in escrow. See DE 22. Plaintiff filed a cross-motion for summary judgment seeking a return of the $52,000 held in escrow and other relief sought in their complaint. See DE 28. The parties consented pursuant to 28 U.S.C. § 636(c) to having me hear all matters in this action.

For the following reasons, plaintiff's motion is denied and defendants' motion is granted.

## BACKGROUND

Although the parties dispute a number of factual details, they agree on the salient events. The following facts are undisputed, unless otherwise indicated.

Events Leading to this Lawsuit

Plaintiff is a Canadian corporation engaged in the business of exporting cars. See Compl. ¶ 4 (verified by Olga Markina, Vice President of Quibec); see also Partial Transcript of Deposition[2] of Olga Markina ("Markina Dep.") (attached as DE 22-3 beginning at 39) at 7. The two corporate defendants are incorporated in the State of New Jersey, with offices in Brooklyn, and Mr. Lysogorsky, the president and principal owner of Unitrans, also conducts business in Brooklyn. See Compl. ¶¶ 5-6; Defs'. Summ. J. Mot. (DE 22) at 5. Unitrans is a licensed non-vessel operating common carrier ("NVOCC") which acts as a transportation intermediary in arranging for cargo to be transported by an ocean carrier. See Declaration of Victoria Farber dated Feb. 27, 2009 ("Farber Decl.") (DE 9) ¶ 21. As an NVOCC, Unitrains is not a vessel owner and, instead, acts as an intermediary, engaging vessel operators and contractors to transport and monitor cargo. See id.; see also Royal & Sun Alliance Inc. v. Ocean World Lines, 612 F.3d 138, 141 n. 2 (2d Cir. 2010) (describing role of NVOCC). As noted by Victoria Farber,[3]

_____

[2] Citations to this and other transcripts herein will be to the page numbers on the transcript and not to docket entry numbers, since the parties filed only excerpts of the transcripts in a number of different filings.

[3] Plaintiff argues that defendant's motion should be denied because Ms. Farber contradicts herself regarding the company for which she works -- stating in her declaration opposing plaintiff's motion for a preliminary injunction that she was operations manager of Unitrans, but later testifying in her deposition that she is the operations manager of FT&T. See Declaration of Douglas Durnin in Opposition to Defendant's Motion for Summary Judgment ("Durnin Decl.") (DE 28) at ¶¶ 11-13 (discussing Exhs. 3 and 4). To be sure, courts determining summary judgment motions will not permit a

operations manager of FT&T, the two defendant corporations "are at the same location, and some of the principal parties are the same." Farber Dep. at 4-5. FT&T is a subcontractor of Unitrans that provides certain support services, including billing and freight collection. See Farber Decl. at ¶ 14.

Sometime prior to December 2008, plaintiff engaged Alexandre Morozov ("Morozov") and STS Group, Inc. ("STS") to arrange for the shipping of seven luxury vehicles to Finland, of which five are the subject of plaintiff's claims herein.[4] See Compl. ¶ 10, 12; Markina Dep. at 71-72. Quibec had previously used Morozov and STS as a broker to purchase vehicles and to arrange for shipping. See Markina Dep. at 31-33. STS was the broker who found and/or assisted in the purchase of the two 2009 Mercedes Benz, the 2006 Lexus and the 2006 Bently at issue in the instant case. Id. at 30-31. STS then contracted with defendant Unitrans to arrange for the

_____

party to create a triable issue of fact by submitting an affidavit that conflicts with prior deposition testimony. See, e.g., Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Palazzo v. Corio, 232 F.3d 38, 43 (2d Cir. 2000). Here, however, the statements at issue were made before defendants' motion and plaintiff had the opportunity in the deposition of Ms. Farber to question her about her statements. Critically, the other information based on statements made by Ms. Farber that are material to determination of the motions at hand have not been otherwise challenged by plaintiff. In any event, the two defendant corporations clearly are affiliated, sharing overlapping ownership and management, and that FT&T performed billing services for Unitrans. See Durnin Decl. (DE 28), Ex. 4 (Tr. Of Farber Dep.) ("Farber Dep.") at 5; DE 49 at 6-7. In fact, Ms. Markina considered Unitrans and FT&T to be the same entity. See Markina Dep. at 61.

[4] The five vehicles in dispute in this action and are identified in the complaint as: Mercedes Benz VIN 452650, Mercedes Benz VIN 464485, Lexus VIN 010656, Bentley VIN 034644 and Mercedes Benz VIN 054649. Compl. ¶ 12.

vehicles to be shipped to the port of Kotka in Finland and Unitrans
issued bills of lading listing STS as the Exporter (or shipper),
Anikin Alexey as Consignee and Unitrans as forwarding Agent. See
bills of lading for the Bentley and other vehicles (attached as
Exhibit G and H to Farber Decl.) (DE 9-8, 9-9); see also Compl.
¶ 10; Markina Dep. at 33.

According to defendants, and not disputed by plaintiff, in the
course of dealings between STS and FT&T, STS had given FT&T liens
on shipped vehicles to secure loans advanced by FT&T to STS for the
purchase of the vehicles. See Declaration of Irina Ianova dated
April 9, 2010 ("Ianova Decl.") (DE 32) at ¶ 2, Exh. G (copies of
checks and lien agreements). The lien agreements required full
payment upon delivery. See id. at ¶ 3, Ex. G. FT&T had a lien
agreement with STS with respect to the financing of the 2006
Bentley VIN No. SCBBR53W66c034644 (the "Bentley") and Unitrans had
possession of the original certificate of title for that vehicle.
See Farber Decl. at ¶¶ 5, 6, Exh. J (bill of sale and lien
agreement). Unitrans also holds the certificates of title for the
other four vehicles, which it needed to clear the vehicles through
U.S. Customs for export and it continued to hold the certificates
as security for freight and other charges. Farber Decl. at
¶¶ 5(b), 6; Exh. B (DE 9-3).

After the cars were transported to Finland, Ms. Markina
received two e-mails from Inga Chemerospva of Unitrans on December
2, 2008 listing the vehicle identification numbers for the five
vehicles, the second of which also stated: "will be released [on]

12/02/08 for Anikin Alexey/Invest Auto." Compl., Exh. A (DE 1) at 14. However, FT&T had asserted a lien on the vehicles for $135,172 owed by STS to FT&T for moneys owed for freight charges and purchase monies provided. See Farber Decl. ¶¶ 12, 14, 15, 19; Ex. I at 2. Unitrans refused to release the vehicles to plaintiff without payment. See id. at ¶¶ 12-13, 20, Exh. A.

Ms. Markina had several conversations with personnel of Unitrans and FT&T about release of the vehicles. See Markina Dep. 64-66. On December 2, 2008, she went to the offices of Unitrans and had a conversation first with Inga and Yelena of Unitrans and was told that the defendants had an issue with STS. See id. at 70. In a subsequent discussion on the same or a later day with Lysogorsky, she was told that STS owed monies to FT&T and had sold the cars to Unitrans as security for the debt. See id. at 63, 64-66, 69, 70. In the course of these discussions, Quibec was also advised by defendants that the vehicles would be sold if the monies owed by STS were not repaid to FT&T. See id. at 69. Quibec ultimately agreed to pay Unitrans $104,000 for release of the five vehicles, with four of the vehicles to be released upon payment of $52,000 and a Bentley to be released upon payment of the balance of $52,000. See id. at 70-71.

Plaintiff understood that the $104,000 was for a debt owed by STS Group, Alexandre Morozov and Diamond Shipping, Inc., another shipping company possibly related to STS Group, to defendants for a transaction unrelated to the shipping of these vehicles. See id. at 70; Compl. ¶¶ 21, 25. Ms. Markina testified that after the

-6-

December 2 meeting, she talked to Morozov, who admitted that STS had gotten loans from FT&T and given cars as security to Unitrans, but that the monies STS owed was for other cars. See Markina Dep. 67-68.

In the course of a discussion involving Markina and Lysogorsky at the defendants' office, Markina called Quibec's attorney, Douglas Durnin, and asked him to prepare an agreement reflecting the terms of the agreed exchange for release of the vehicles. See Markina Dep. at 76-77 (referring to agreement between Unitrans-Pra and 9178-6103 Quibec Inc.). The agreement was faxed with a cover sheet indicating that it had been faxed from Mr. Durnin to Mr. Lysogorsky on December 8, 2008 (the "Agreement") and bore the typewritten notation "Enc 2 agreements re 7 cars then 7 cars D Durnin." See Exh. E to Declaration of Joseph DeMay in support of defendant's motion ("DeMay Decl.") (DE 22-3). Although she testified that Lysogorsky may have signed the agreement in her presence, Markina could not remember whether she took the agreement when she left. See Markina Dep. 78-81. Farber claims that as she was photocopying the agreement, Markina grabbed the agreement and promised to send a copy, but never did. See Farber Decl. at ¶ 11.

After Unitrans wired $52,000 to Unitrans or FT&T four or five days later, defendants released four of the vehicles, but continued to hold the Bentley. See Markina Dep. at 71-74. There were discussions thereafter between the plaintiff and someone from Unitrans regarding the second payment of $52,000 and release of the Bentley. See id. at 75.

All documentation concerning the Bentley "is in the hands of Defendant Unitrans or their agent overseas . . . ." Affirmation of Douglas Durnin dated Januaury 9, 2009 (DE 3) at ¶ 8.

## This Action

On January 13, 2009, plaintiff commenced this action by Order to Show Cause seeking a preliminary injunction requiring defendants to release the Bentley. <u>See</u> DE 2. Following a hearing before the Honorable Jack Weinstein, the parties agreed to the entry of a consent order, which provided that defendants would release the Bentley to plaintiff in exchange for plaintiff placing $52,000 in escrow. <u>See</u> DE 14. This transaction was successfully accomplished. Defs.' Summ. J. Mem. (DE 22-4) at 2-3.

In its Complaint, plaintiff claims it paid the $52,000 for release of four of the cars under duress. <u>See</u> Compl. ¶ 14. As Ms. Markina testified, her company was under pressure to deliver the cars to purchasers in Russia. <u>See</u> Markina Dep. at 70-71. Plaintiff also claims that because plaintiff owned the vehicles, defendants could not legally assert a lien on the vehicles for a debt arising from an unrelated transaction with the shipper. <u>See</u> Compl. ¶¶ 15, 21. Plaintiff asserts that the Bentley is a rare model and that it would not be able to procure it from another source quickly enough to fulfill its contract with a buyer who had arranged to purchase it. <u>See</u> <u>id.</u> ¶ 29. Plaintiff alleges that it paid all the shipping costs for the cars through STS Group and that it has offered to pay the shipping costs again, which it estimates

based on past experience to be approximately $5,000.  See id.
¶¶ 17, 27.  Plaintiff seeks monetary damages in the amount of at
least $226,000 for the value of the Bentley, the lost profits from
the sale of the Bentley, an additional import tariff plaintiff paid
on account of defendants' hold on the vehicle and the $52,000
already paid to defendants.[5]  See id. ¶¶ 19, 30, 31.

As defendants point out in their submissions, Unitrans and
FT&T were involved in a different action entitled Transatlantic
Auto Group, Inc. v. Unitrans-Pra Co., Inc., 08 CV 5070, and
obtained a default judgment against STS and Morozov in the amount
of $91,771.  See id., 2011 WL 4543877, at *13-14 (E.D.N.Y Sept. 9,
2011), adopted, 2011 WL 4543838 (Sept. 29, 2011).  In the Report
and Recommendation regarding the default judgment, Judge Pollack
took into account the $52,000 paid by Quibec in recommending a
total award of $91,771 against STS and Morozov.  See id. at *13.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits show
that there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c).  The Court's responsibility is to determine if there is a
genuine issue to be tried, and not to resolve disputed issues of

---

[5] Plaintiff also requested relief in the form of replevin of the
vehicle and an injunction requiring defendants to return the
vehicle and preventing them from selling or otherwise disposing of
it.  See Compl. ¶ 38.  These two requests are moot in light of the
parties' consent order.

fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
The Court must draw all reasonable inferences and resolve all
ambiguities in the nonmoving party's favor and construe the facts
in the light most favorable to the nonmoving party. Id. at 254-55.
However, summary judgment may be granted "[i]f the evidence is
merely colorable, or is not significantly probative." Id. at 249
(citation omitted).

The moving party bears the initial burden of demonstrating an
absence of material facts and once it has done so, the burden
shifts to the non-moving party. Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986). A genuine issue for trial exists if, based on
the record as a whole, a reasonable jury could find in favor of the
nonmoving party. Anderson, 477 U.S. at 249.

As an preliminary matter, this Court notes that the parties
apparently agree that this Court has jurisdiction over this matter
pursuant to its admiralty jurisdiction to hear maritime disputes.
See U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1333(1).
Plaintiff also invokes COGSA, which "applies to a carrier engaged
in the carriage of goods to or from any port in the United States."
46 U.S.C. § 30702(a). The Supreme Court has observed that "[t]he
boundaries of admiralty jurisdiction over contracts––as opposed to
torts or crimes––being conceptual rather than spatial, have always
been difficult to draw." Kossick v. United Fruit Co., 365 U.S.
731, 735 (1961). The Court explained that "the true criterion" of
whether maritime law governs a case "is whether it has reference to
maritime service or maritime transactions." Norfolk S. Ry. Co. v.

Kirby, 543 U.S. 14, 23 (2004) (internal quotation marks and citation omitted).

Although the Agreement in dispute concerns delivery of the vehicles that are already on land, its "principal objective" is resolution of dispute concerning "maritime commerce" governed by Bills of Lading that are essential to understanding the parties' rights and obligations that underlie the Settlement Agreement. See id. at 25. Defendant Unitrans was indisputably a party to the bills of lading (DE 9-8, 9-9), defendant FT&T claims to have contracted with STS Group for a lien on the cargo, see Farber Decl. ¶¶ 9, 14, and plaintiff claims to be the owner of the vehicles and to have purchased the cars and arranged for their transport with STS Group, see Compl. at ¶ 10. Because the rights and obligations of the parties to this action arise out of a maritime transaction that "'may well have been made anywhere in the world,'" this matter "'should be judged by one law wherever it was made.'" Norfold S. Ry., 543 U.S. at 29 (quoting Kossick, 365 U.S. at 741).

Defendants argue that they are entitled to summary judgment on the basis of the Agreement, which was drafted by plaintiff's attorney and represents a compromise between the parties from the original amount owed to defendants. See Defs.' Summ. J. Mem. at 2; Farber Decl. ¶ 11. Defendants assert, without argument from plaintiff, that the Agreement is valid even though lacking signatures. See Defs.' Summ. J. Mem. at 3-4. The Supreme Court has affirmed that "it is an established rule of ancient respectability that oral contracts are generally regarded as valid

by maritime law" and that maritime contracts "do not as a generality depend on writing for their validity." Kossick, 365 U.S. at 734 & n. 4; see also Texaco Export, Inc. v. Overseas Tankship Corp., 573 F.2d 717, 720 n.8 (2d Cir. 1978) ("oral maritime contracts are valid and enforceable").  Agreements that are reduced to writing but not yet signed are analyzed according to the same principles of contract law as oral agreements.  See A/S Custodia v. Lessin Int'l, Inc., 503 F.2d 318, 320 (2d Cir. 1974); see also Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997) (citing cases analyzing unsigned and oral agreements under federal common law).

In order to form a valid oral or unsigned maritime agreement, "a meeting of the minds on a maritime contract" must occurs and the parties must agree on "all the essential terms." Great Circle Lines, Ltd. v. Matheson & Co., Ltd., 681 F.2d 121, 124-25 (2d Cir. 1982); see also Muller Boat Works, Inc. v. Unnamed 52' House Barge, 464 F. Supp. 2d 127, 139 (E.D.N.Y. 2006) ("To form a binding contract, the parties must have agreed on all materials terms of a contract and clearly express their intention to be bound by those terms") (internal citations omitted); Tarstar Shipping Co. v. Century Shipline, Ltd., 451 F.Supp. 317, 322-23 (S.D.N.Y. 1978) (finding maritime charter valid because "proof in this case clearly establishes that there was a meeting of the minds" even though one party did not sign it), aff'd, 597 F.2d 837 (2d Cir. 1979).

Putting aside plaintiff's claim of duress, the unsigned agreement clearly establishes all the terms material to the

Agreement. The parties to the Agreement are identified, the vehicles to be released are listed according to make, model, year and vehicle identification number ("VIN"), the exchange is described in sufficient detail to notify the parties of their obligations at each step of the settlement and the timing of each step is clearly provided. See Agreement (DE 22-3, Ex. E) at 1-2. Furthermore, neither party disputes that representatives from the two corporations and defendant Lysogorsky understood the terms; in fact, plaintiff's counsel, Douglas Durnin, faxed the agreement to Unitran's office, and Lyosgorsky then signed the Agreement. See Farber Decl. ¶ 11. Therefore, I find that there has been an adequate meeting of the minds and the Agreement is valid on its face in spite of the lack of signatures from the parties on the copy proffered to the Court.

Plaintiff argues that the unsigned Agreement is unenforceable because it was produced under pressure and under duress. See Durnin Decl. at ¶ 10. Federal courts examining issues of duress pursuant to maritime law often analyze the elements according to general principles of contract law. See Transmarine Seaways Corp. of Monrovia v. Marc Rich & Co. A.G., 480 F. Supp. 352, 359 (S.D.N.Y. 1979) (examining the definition of duress under, inter alia, the Restatement of Contracts); In re Park West Galleries Inc. Mktg. & Sales Practices Litig., MDL No. 09-2076 RSL, 2010 WL 2640262 at *2 (W.D. Wash. June 25, 2010) ("federal common law as set forth in the Restatement (Second) of Contracts governs" dispute over invoices for maritime transportation); Reed v.

-13-

Gallegos, C.A. No. C-07-190, 2008 WL 2714082, at *2 & n.3 (S.D. Tex. July 9, 2008) (federal common law is derived from the Restatements and shares core principles with the common law of contracts in force in most states); Tetrev v. Pride Int'l, Inc. 444 F. Supp. 2d 524, 528 (D.S.C. 2006).

Other courts, deeming federal common law insufficiently developed to provide a useful framework with which to examine duress, employ state law. See Palmer Barge Line, Inc. v. S. Petroleum Trading Co., Ltd., 776 F.2d 502, 505 n. 4 (5th Cir. 1985) ("in the absence of a clearly established judicially-fashioned maritime rule, this Court may refer to relevant state law); Berge Helene Ltd. v. GE Oil & Gas, Inc., 830 F. Supp. 2d 235, 246 (S.D. Tex. 2011), superceded on other grounds, 896 F. Supp. 2d 582 (S.D. Tex. 2012). I will apply general principles of contract law, which I find to be sufficiently clear and defined to give the parties adequate notice of their obligations. In any event, New York state law and federal common law analyze duress under substantially similar standards.[6] See, e.g., Francis v. Home Box Office, Inc., No. 04 Civ.7430(DLC), 2005 WL 1020863, at *3 (S.D.N.Y. Apr. 28, 2005) (citing both New York and federal common law for the

---

[6] The elements of duress under New York law are: "(1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of the contract terms, (4) because the circumstances permitted no alternative." Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir. 1989); see VKK Corp. v. Nat'l Football League, 244 F.3d 114, 122 (2d Cir. 2001) (economic duress occurs where "one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury") (internal quotation marks and citation omitted).

-14-

proposition that "[a]n otherwise enforceable agreement may be
voidable because of duress where, among other things, the party
asserting duress received a wrongful or improper threat"); Von
Grabe v. Ziff Davis Publ'g Co., No. 91 Civ. 6275 (DLC), 1994 WL
719697, at *4 n.4 (S.D.N.Y. Dec. 29, 1994) (declining to decide
whether New York, Florida or federal common law applied because
they are "similar in their requirements for a showing of duress").

As defined in the Second Restatement of Contracts, duress
occurs when "a party's manifestation of assent is induced by an
improper threat by the other party that leaves the victim no
reasonable alternative."  Restatement (Second) of Contracts § 175.
Significantly, a threat is not improper where the party urging
assent "threaten[s] to take action which is legally permissible."
Kamerman v. Steinberg, 891 F.2d 424, 432 (2d Cir. 1989) (citing New
York law) (internal quotation marks and citation omitted).  In
order to be considered improper, the threatened course of action
must be "'wrongful,' i.e., outside a party's legal rights."
Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n, 655 F.3d 136,
142 (2d Cir. 2011).  In Interpharm, the Second Circuit
distinguished between a permissible threat and an improper threat,
explaining that "a threat to withhold performance that one is
contractually obligated to provide in order to compel the other
party to submit to new demands can constitute a wrongful threat.
But a threat to exercise a legal right in pursuit of those same
demands cannot."  Id. (internal citations omitted).

In support of their assertion that STS Group owed them money on this shipment, defendants have provided copies of checks made out by FT&T to STS Group, a check returned to FT&T from STS Group for insufficient funds and an agreement between FT&T and STS for shipment of one of the vehicles in support of this contention. Farber Decl., Exs. F, I, J (DE 9-8, 9-11, 9-12). Moreover, as noted previously, defendants obtained a default judgment against STS Group and Mr. Morozov for obligations of the intermediary for purchase and shipment of these vehicles. See Transatlantic, 2011 WL 4543877, at *22. Their damages calculations were supported by, inter alia, an uncashed check from STS Group for $135,157 listing the VINs of five of the vehicles in dispute and an invoice from defendants to STS Group for the vehicles that is reduced by the $52,000 paid by Quibec. See id. at *13-14. Therefore, I find that there is no genuine dispute that STS Group and Mr. Morozov failed to pay defendants moneys owed for the purchase and shipment of these vehicles.

Next, this Court addresses whether the defendants had a basis to assert a lien over the five vehicles and refuse to release them upon arrival in Finland, since that refusal ultimately led to the Agreement that defendants seek to enforce. As defendants point out, STS was listed as the "Exporter (Principal or seller...)" on the bills of lading issued by Unitrans. See DE 9-9. Generally, a bill of lading serves as an acknowledgment by a carrier that it has received goods for shipment, functions as a contract of carriage and "'if the bill is negotiated, [] controls possession of the

goods and is one of the indispensable documents in financing the movement of commodities and merchandise.'" Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 141 n. 3 (2d Cir. 2010) (quoting 1-2 Saul Sorkin, Goods in Transit § 2.01); see also APL Co. Pte. Ltd. v. UK Aerosols Ltd., 582 F.3d 947, 952 (9th Cir. 2009) (citing UCCC § 1-201(b)(6)). Defendants argue that the bills of lading here are non-negotiable because they "state[] that the goods are to be delivered to a consignee." 49 U.S.C. § 80103(b)(1). The bills of lading for the vehicles at issue here specify Anikin Alexey as the consignee rather than being made to order. See DE 9-9. Although the bills of lading do not specify that they are non negotiable, as required by section 80103(b)(2), there is no reason not to consider the applicability of the other statutory provisions governing bills of lading[7] or caselaw regarding straight bills of lading. As defendants point out, prior to transfer to the consignee, the vehicles could be subject to the liens of creditors of the transferor. See 49 U.S.C. § 80106(c)(A).

Moreover, defendants held the title documents for all the vehicles, as well as the security agreements by the record owner of the vehicles. Because FT&T exercised its rights under the security agreements signed by STS, Unitrans properly refused to release the

---

[7] The differences in the functions of negotiable and non-negotiable bills of lading are not of significance here. Because a "negotiable bill of lading is a document of title," unlike a non-negotiable bill, which "functions more like a receipt," "[p]roduction of the original bill is not a pre-condition to delivery where a non-negotiable bill of lading is involved." Dynamic Worldwide Logistics, Inc. v. Exclusive Expressions, LLC, 77 F. Supp. 3d 364, 374 n.3 (S.D.N.Y. 2015).

vehicles upon demand by plaintiff, whose name nowhere appears on any of the bills of ladings.

Although defendants focus their argument on the status of plaintiff in relation to the goods, specifically disputing plaintiff's contention that defendants knew that Quibec was the rightful owner of the vehicles, see DeMay Decl. ¶ 11, the Court's analysis does not depend on whether plaintiff is the owner or consignee of the goods.[8]  The central issue is whether, even if plaintiff is deemed the rightful owner of the goods, defendants were entitled to demand additional moneys owed to them by STS Group from plaintiff.

For the purposes of defendants' motion and drawing all inferences in favor of the non-movant, plaintiff is deemed the owner of the goods.  In spite of defendants' protestations that plaintiff was not listed on the Bills of Lading, plaintiff's actions in requesting release of the cargo, describing the

_____

[8]  In any event, this Court finds that plaintiff's argument that defendants had knowledge that plaintiff was owner of the vehicles factually insufficient.  Plaintiff points to the two e-mails it received from Inga Chemerisova of Unitrans as evidence of Unitrans' knowledge as to ownership of the vehicles.  However, simply being the party for notification is not sufficient to establish ownership or title to the vehicles.  Being "listed in the bill of lading as the party to be notified raises no presumption that [the recipient of the notice] was the intended consignee."  Columbia Trading Corp. v. Moore-McCormack Lines, Inc., 374 F.2d 864, 865 (2d Cir. 1967); see N. Pa. R.R. Co. v. Commercial Nat'l Bank of Chicago, 123 U.S. 727, 736 (1887) ("If [notify parties] were consignees, the direction to notify them would be entirely unnecessary, because the duty of the carrier is to notify the consignee on the arrival of the goods at their place of destination."); Hangzhou Leather Prods. Indus. v. Air City, Inc., No. 96 CV 1590, 1997 WL 722700, at *2 (E.D.N.Y. Sept. 19, 1997).

consignee listed on the Bills of Lading as its agent and
negotiating the Agreement -- and defendants' ultimate acquiescence
in negotiating with plaintiff as the owner of the goods --
establish plaintiff's ownership of the goods.  See A/S
Dampskibsselskabet Torm v. Beaumont Oil Ltd., 927 F.2d 713, 717 (2d
Cir. 1991) (although not stated on the relevant bill of lading,
party may be deemed a presumptive owner if it exercises dominion
and control over the cargo); see also States Marine Int'l, Inc. v.
Seattle-First Nat'l Bank, 524 F.2d 245, 248 (9th Cir. 1975).  The
terms and conditions of the Bills of Lading also specify that they
apply to "the owner of the goods" and "the receiver" of the cargo,
who may be but is not required to be named as the consignee or
shipper.  See Terms and Conditions (DE 41, Ex. K at ¶ 1).

     In any event, plaintiff's status with respect to the goods at
the time of shipment is moot for two reasons.  First, it is widely
accepted that a cargo owner accepts the terms of a bill of lading
by suing on it.  See Federal Ins. Co. v. M/V "Ville D'Aquarius",
No. 08 Civ. 8997 (PKC), 2009 WL 3398266 at *4 (S.D.N.Y. Oct. 20,
2009) (although bill of lading was never provided to plaintiff, it
was nevertheless bound by forum selection clause because "courts in
this and other Circuits generally hold that a party suing on a bill
of lading has consented to the terms of that bill of lading"); A.P.
Moller-Maersk A/S v. Ocean Express Miami, 550 F. Supp. 2d 454, 464
(S.D.N.Y. 2008) (citing cases); see also Kukje Hwaje Ins. Co., Ltd.
v. M/V Hyundai Liberty, 408 F.3d 1250, 1254 (9th Cir. 2005).
Plaintiff claims that a copy of the Bill of Lading for one of the

vehicles was forwarded to it at some point during the shipment or
the parties' discussions, so it is clear that it was on notice of
the terms and conditions of the Bills of Lading.  See Durnin Decl.
¶ 7.  Second, pursuant to the Consent Order agreed to by the
parties, plaintiff has taken ownership of four of the vehicles.

As between the carrier of goods and other parties to a bill of
lading, it is well established that under maritime law "a carrier
has not only the right but also the duty to recover its proper
charges for services performed." S. Pac. Transp. Co. v. Commercial
Metals Co., 456 U.S. 336, 343-44 (1982).  Although a shipper has
"primary responsibility" to pay shipping charges, a consignee who
receives a shipment "'becomes legally bound to pay the freight
charges.'" A/S Dampskibsselskabet Torm, 927 F.2d at 717 (quoting
Dare v. New York Cent. R.R., 20 F.2d 379, 380 (2d Cir. 1927)); see
also Maersk v. Alan Marketing, Inc., 1998 WL 167323, at *3
(S.D.N.Y. Apr. 10, 1998) ("It is a fundamental principle of
maritime law that ocean freight for the transportation of goods is
payable upon delivery."); In re Alumni Enterps. Inc., 191 B.R. 554,
556 (Bkrtcy. W.D.N.Y. 1996) ("upon acceptance of delivery, the
consignee becomes an additional obligor for payment of [shipping
charges]").

This general rule is justified by the Supreme Court's
observation that "[i]n intercontinental ocean shipping, carriers
may not know if they are dealing with an intermediary, rather than
with a cargo owner.  Even if knowingly dealing with an
intermediary, they may not know how many other intermediaries came

before, or what obligations may be outstanding among them."
Norfolk S. Ry., 543 U.S. at 34-35.  When the shipper engages any
shipping intermediaries, it is necessarily "in the best position to
avoid liability for double payment by dealing with a reputable
freight forwarder, by contracting with the carrier to eliminate the
shipper's liability, or by simply paying the carrier directly."
Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co., 513 F.3d
949, 959 (9th Cir. 2008); see also Harms Farms Trucking v. Woodland
Container, No. 4:05CV3185, 2006 WL 3483920 at *5 (D. Neb. 2006)
(when consignee paid intermediary, "it took the risk that
[intermediary] would not, in turn, pay [carrier]").  This is
particularly true where, as here, "[t]he bills of lading clearly
were marked 'collect,' which put [owner of goods] on notice that
payment was due" and both parties are experienced corporations able
to negotiate liability limitations or different methods of payment.
Oak Harbor, 513 F.3d at 960.

    For these reasons, courts have recognized the right of a
carrier to assert a lien on cargo for unpaid fees.  See, e.g.,
Johnson Prods. Co., Inc. v. M/V La Molinera, 628 F. Supp. 1240,
1248 (S.D.N.Y. 1986) (carrier "had issued its bills of lading, had
earned its freight by carrying the goods . . . and so could
exercise its lien against the goods. The bills of lading so
provide, and in any event such a lien accords with general maritime
law"); Logistics Mgmt., Inc. v. One (1) Pyramid Tent Arena, 86 F.3d
908, 913-14 (9th Cir. 1996) (carriers, like vessel owners, have the
right to assert a lien for unpaid freight against the cargo they

transport); <u>Melwire Trading Co., Inc. v. M/V Cape Antibes</u>, 811 F.2d 1271, 1273 (9th Cir. 1987) ("It is well-established that breach of a shipping contract may give rise to a maritime lien.").

In addition, the Bills of Lading confirm that the "Carrier shall be entitled to all freight and charges due hereunder, including. . .  any payments made and liabilities incurred in respect to the goods."  Terms and Conditions, ¶ 13.  The terms and conditions also anticipate nonpayment by an intermediary; any "failure of [a] forwarding agent to pay any part of the freight to Carrier shall be considered a default by the shipper and consignee in the payment of freight."  <u>Id.</u> ¶ 13.  It also provides that the "Carrier shall have a lien on the goods . . . for all freight, charges, indemnities, and sums due under this bill of Lading, and may enforce this lien . . . ."  <u>Id.</u> at ¶ 15.

Courts in this district have consistently upheld other bill of lading provisions against a cargo owner, including those that are "accepted by . . . [an] intermediary if that party was acting on behalf of the owner, or was acting as the owner's agent, even if the cargo owner was not a party to the bill of lading."  <u>Laufer Grp. Int'l. v. Tamarack Indus., LLC</u>, 599 F. Supp. 2d 528, 530 (S.D.N.Y. 2009) (citing cases); <u>see</u> <u>Stolt Tank Containers, Inc. v. Evergreen Marine Corp.</u>, 962 F.2d 276, 280 (2d Cir. 1992) (where cargo owner contracts with intermediary to ship packages, owner is bound by bill of lading agreed to by the shipper).  Plaintiff offers no reason why this Court should not enforce these or any provisions of the Bills of Lading.

Another set of documents proffered by defendants bearing the title "Shipping Instructions" and signed by Mr. Morozov confirm that the consignee is to be billed for the vehicles. See Farber Decl. ¶ 6, Exs. C at 1, D (DE 9-5, 9-6). As discussed, although plaintiff is not listed on the Shipping Instructions as the consignee, plaintiff as receiver and presumptive owner of the goods comes within the definition of consignee used in the Bills of Lading, of which it had notice. Furthermore, the Shipping Instructions are marked "Collect," some stating an amount and some blank. Id., Exs. C, D. In conjunction with the Bills of Lading, which specifically provide that a consignee may be liable for additional charges owed for the cargo, it is clear that plaintiff is liable for amounts that STS Group owed defendants for the vehicles. In addition, defendants have proffered another set of agreements between defendants and STS Group that clearly entitle defendants to receive payment for at least two of the vehicles upon delivery (the "Lien Agreements"). See Ianova Decl., Ex. G (DE 32-3) at 13 (lien for Mercedes VIN 452650); Farber Decl. ¶¶ 19, 20 (lien agreement between FT&T and STS Group stated that FT&T would withhold delivery of goods until it was re-paid for agreed-upon sums and STS Group owed FT&T $135,172 as of December 2, 2008); Ex. J (DE 9-12) at 1 (lien for Bentley). As previously discussed, an invoice and check presented by defendants to the court in Transatlantic further establish the existence of STS Group's obligation to defendants for the vehicles. Plaintiff does not dispute the authenticity or validity of any of the shipping

instructions, the bills of lading or the lien agreements, and I find no cause to declare them invalid. Nor does plaintiff offer anything except conclusory allegations to dispute defendants' characterization of the debt owed to them by STS Group.

Therefore, I find that defendants, both as carriers and as contractual lienholders of the vehicles, were legally entitled to demand payment for the vehicles from plaintiff when it claimed ownership of them. Because defendants had the right to demand payment of the debt by plaintiff, defendants' ultimatum to plaintiff that it must pay a sum of money to recover the vehicles does not constitute an improper threat. In the absence of an improper threat, I find that the Agreement between the parties was not made under duress. Accordingly, since the Bentley has been released, defendant is entitled under the terms of the Agreement to the $52,000 that is currently held in escrow by plaintiff's counsel.

Also, as defendants argue, plaintiff has no viable claims against defendant Lysogorsky, who is an owner of Unitrans and signed the Agreement in his official capacity as such. See Defs.' Summ. J. Mem. at 5. There has been no evidence presented indicating that Lysogorsky acted in a manner other than as President of Unitrans.

Last, as previously discussed, defendants have been awarded default damages against STS Group and Mr. Morozov for the debt incurred during shipment of the vehicles by this district court in the lawsuit previously discussed. See Transatlantic, 2011 WL

4543877, at *22.  Defendants have previously advised that they have not recovered any monies on their default judgment and, at the Court's request, recently confirmed that they still have not recovered any part of the default judgments.[9]  See letter of Vincent M. DeOrchis dated October 16, 2018 (DE 56).  Thus, defendants will not be receiving a double recovery for the debt of STS Group.  Cf. In re Cohen, 422 B.R. 350, 375-76 (E.D.N.Y. 2010) ("Although Appellee cannot receive double recovery, Appellee's claims remain valid against both Cohen and Wissak until payment, not mere judgment") (emphasis in original); Federal Ins. Co. v. PGG Realty, LLC, 529 F.Supp.2d 460, 463-64 (S.D.N.Y. 2008) ("While double recovery is barred, it is well-established that, until finally paid, a claimant may seek recovery of the same loss from two different parties").

---

[9]  Defendants dispute that the judgments were for the same cargos of automobile or damages herein.  This Court disagrees, as Judge Pollak in her Report and Recommendation points to the same dishonored checks as mentioned in the Farber declaration, and, critically, the $52,000 payment made by Quibec in this action.  See Transatlantic, 2011 WL 4543877 at *13-14.

<u>CONCLUSION</u>

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's cross-motion is denied. Plaintiff's counsel is directed to release to defendants the $52,000 currently held in his escrow account.

**SO ORDERED.**

Dated:    Brooklyn, New York
          October 17, 2018

                              /s/_____
                              MARILYN D. GO
                              UNITED STATES MAGISTRATE JUDGE